1 | Gregory A. Rougeau (194437)
BRUNETTI ROUGEAU LLP
2 | 235 Montgomery Street, Suite 410
San Francisco, California 94104
3 | Telephone: (415) 992-8940
Facsimile: (415) 992-8915
4 | E-mail: grougeau@brlawsf.com
5 | Counsel for ARTEM KOSHKALDA
Debtor and Debtor-in-Possession
6
7
8 | UNITED STATES BANKRUPTCY COURT
9 | NORTHERN DISTRICT OF CALIFORNIA
10 | SAN FRANCISCO DIVISION
11
12
13 | In re: | Case No. 18-30016-HLB
14 | ARTEM KOSHKALDA, | Chapter 11
15 | Debtor. | **DECLARATION OF ARTEM KOSHKALDA IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION BY CREDITORS SEIKO EPSON CORPORATION AND EPSON AMERICA, INC. (A) TO DISMISS THE CASE OR (B) IN THE ALTERNATIVE, FOR APPOINTMENT OF A TRUSTEE, RELIEF FROM STAY, ETC.**
16
17
18
19
20 | | Hearing:
21 | | Date: February 8, 2018
Time: 10:00 a.m.
22 | | Place: Courtroom 19
450 Golden Gate Avenue
23 | | San Francisco, CA 94102
Judge: Hon. Hannah L. Blumenstiel
24
25
26
27
28

I, Artem Koshkalda, declare:

1. I am the debtor and debtor-in-possession herein, and am also the managing member of ART, LLC ("ART"), debtor and debtor-in-possession in Chapter 11 Case No. 18-30014.

2. I make this declaration in support of the Opposition (the "Opposition") to the motion by Creditors Seiko Epson Corporation and Epson America, Inc. (collectively, "Epson") (a) to Dismiss the Case or (b) in the Alternative, for Appointment of a Trustee, Relief from Stay, Etc. (the "Motion").

3. As to the facts in this declaration, I know them to be true of my own knowledge or have obtained knowledge of them from my review of the business records of the Debtor concerning this matter. If called upon to testify as to the matters set forth in this declaration, I could and would competently testify thereto. As to those matters stated in this declaration on information and belief, I believe them to be true.

4. I am a real estate investor, and, through ART, am in the business of marketing and selling office products and supplies. My initial reorganization strategy in this case is to sell real properties, and continue ART's operations, for the benefit of all my creditors.

**REAL ESTATE ASSETS**

5. Either individually or through limited liability companies of which I am sole manager and member, I have interests in 13 different properties in California and Florida. The estimated cumulative equity in those properties is $2,309,600.71, but that equity cushion is diminishing, as default interest for loans secured by some of the properties is accumulating, and I have been prohibited from selling the properties, as described below.

6. If permitted to obtain investors and to continue to speculate in real property, I believe that I can obtain the same results through reorganization that I have achieved in the real estate market in prior years. Since December 2016, and until being precluded from making any sales of property by the U.S. District Court for the District of Nevada (discussed below) seven months later, I effected the sale of ten properties in the San Francisco Bay Area. Those sales resulted in profits, before fees and taxes, of $1,198,759.00. If permitted to engage in real estate

DECLARATION IN SUPPORT DEBTOR'S OPPOSITION TO MOTION TO DISMISS, ETC.

1   sales again, I am confident that the results going forward will be similar, as the real estate

2   market in the Bay Area remains robust.

3       **ART'S BUSINESS.**

4       7.      ART is a Nevada limited liability company.  I am its sole member and manager.

5   ART was formed in or around February of 2012 and began selling computer printers as its

6   primary business, and, to a lesser extent, ink cartridges and beauty products.  Epson ink

7   cartridges were a small percentage of the company's sales, as its primary business line was

8   printers and it sold, in addition to Epson, ink cartridges for HP, Brother, Canon, and Lexmark

9   printers.

10      8.      ART bought genuine Epson cartridges for a low price abroad and sold them

11  domestically at a higher price, but a price that was lower than what Epson was charging its own

12  customers.  This was possible because Epson's pricing model discriminates between its U.S.-

13  based customers and its international customers.  Epson sells printers in the United States at a

14  low price but sells their ink cartridges at a steep price.  In Asia, Epson sells printers at a steep

15  price, but prices its ink cartridges inexpensively.  There is no difference in the ink or the printers

16  – so any sophisticated consumer would buy ink abroad and printers domestically.  Epson forces

17  its customers to pay higher prices by designing its U.S-sold printers to require a chip that it

18  inserts in its U.S.-sold ink cartridges which is incompatible with the chips in cartridges it sells

19  abroad.

20      9.      ART began purchasing genuine Epson ink cartridges from suppliers in China and

21  elsewhere, importing them into the U.S., and then selling them to its customers.  These were

22  bought in bulk, with the cartridges still in their original vacuum-sealed bags.  Among its

23  customers were InkSystem and Lucky Print.  In addition to selling them genuine Epson ink

24  cartridges bought in China, ART also sold InkSystem and Lucky Print a chip that could be

25  inserted into the cartridges bought in China so that they would work in Epson printers sold in

26  the U.S.  ART never sold Epson cartridges in an altered state, nor did it ever place, or alter, an

27  Epson trademark on the cartridges.

28      10.     I am informed and believe Epson makes the following allegations:  InkSystem

DECLARATION IN SUPPORT DEBTOR'S OPPOSITION TO MOTION TO DISMISS, ETC.

and Lucky Print would open up the vacuum sealed bags and modify the cartridges to remove their chip and replace it with a compatible chip; They would remove the Epson label that was printed in Chinese, or other foreign language, and replace it with a verbatim Epson label that was printed in English; Thus, they converted the genuine Epson cartridges that they purchased from ART into remanufactured cartridges. By contrast, ART has never made or sold remanufactured cartridges as I understand that term. ART has a different business model than InkSystem and Lucky Print.

### THE INFRINGEMENT ACTION.

11.     On September 8, 2016, Epson filed the Infringement Action against ART, myself, InkSystem, Lucky Print, and many others in the Nevada federal court, Case No. 3:16-cv-00524-RCJ-VPC, claiming that ART and its co-defendants were selling counterfeit Epson ink cartridges. On September 13, 2016, the District Court entered an order for a preliminary injunction enjoining the collective defendants from directly or indirectly infringing Epson's trademarks. The order did not extend to sales of remanufactured products so long as they are sold as remanufactured products or the lawful resale of genuine Epson branded cartridges that have not been altered and are not materially different from Epson genuine products. Thus, I understand that under the District Court's analysis, ART's business model – the sale of genuine Epson cartridges (in their original, unopened, vacuum sealed bags) along with parts (the chips) for remanufacturing cartridges is not infringement.

12.     The Nevada District Court entered the TRO on July 31, 2017. As a result of the TRO, ART and I were unable to pay for lawyer's fees, and counsel withdrew with leave of the District Court on August 4, 2017, four days after the TRO. I attempted to withdraw $3,000 from Bank of America, but due to the breadth of the court's orders, the bank would not allow me to make that withdrawal. I notified the District Court, and made multiple requests to the District Court and to the Ninth Circuit for an order directing that the bank honor that allowance, to no avail.

13.     On August 16, 2017, Epson filed *Plaintiffs' Emergency Ex Parte Application for*

*Order to Show Cause re Contempt as to Artem Koshkalda and Vladimir Westbrook*, alleging that I had sold two properties and listed five others in violation of the TRO that had been entered on July 31, 2017. Epson sought to compel me to appear in the Nevada District Court to account for the real estate sold, and additional protections to prevent further sales. Epson insisted that I appear in the Nevada District Court even though I had previously advised the Magistrate Judge in their presence, about four days earlier, that I had no funds available due to the seizure.

14. The two properties that were sold were the subject of sale orders that had been entered into prior to the issuance of the TRO. The sale contract was entered to sell the first property, located at 1791 Lucretia Avenue, San Jose, on July 3, 2017. The sale closed on August 1, 2017, a day before Epson served me with the TRO, which had been obtained *ex parte* and of which I was unaware. The sale of this property was not a violation of the TRO.

15. The sale contract was entered to sell the second property, located at 1012 Giacomo Lane, San Jose, CA 95131 on July 11, 2017, before the TRO issued. The closing of the sale of the second property was due to my mistaken reading of the TRO in the absence of counsel. Had I cancelled the pending sale, I believed there would have been substantial breach of contract damages that would have been assessed against the property. I believed that closing the sale might violate the TRO, but that cancelling the sale that had begun 3 weeks before the TRO was issued would have resulted in defaults and breach of contract claims that would have encumbered the property – which I understood was also prohibited by the TRO.

16. I listed the other properties for sale to prevent diminution of their value, as default interest accumulated. The properties at issue had been bought at the early stages of construction pursuant to high interest loans, with the intent that they would be "flipped" as construction neared completion and a target profit margin was achieved. Due to the TRO, I was prohibited from making payments to service the debt on these properties, and the default interest rates that would be triggered on default would wipe out the equity in the properties. This would be devastating, and would harm ART, its creditors, and me and my creditors. My lawyer had withdrawn from the case because due to the TRO, there were insufficient funds to

pay legal fees. I believed that the pending recommendation from Magistrate Judge Cooke for entry of terminating sanctions had been entered based on erroneous Epson representations. I believed the TRO was entered as fruit of those errors.

17. I believed that the TRO would be overturned if I could find counsel to pursue its reversal, and that I needed to stop the financial bleeding by selling the properties before they had no remaining equity. When Epson filed the Contempt Order, I cancelled the listing of those properties, which have not been sold, but are now subject to substantial default interest due to the inability to service the debt due to the TRO.

18. I have always tried to be responsive to discovery and to the orders of the Nevada District Court. In response to written discovery, ART produced (or contributed to the production) of over 14,000 pages of documents responsive to Epson's discovery requests.

19. On March 28, 2017, I was deposed in Long Beach, California by Epson's counsel, Annie Wang. I was represented by counsel, Christopher Austin, during the deposition. The deposition lasted for over 9 hours, and I provided testimony that was transcribed over 329 pages. On several occasions, my counsel helped me to understand questions or helped me to be better understood as English is not my first language.

20. A warrant for my arrest was issued on October 27, 2017 due to my not appearing at a hearing scheduled for October 23, 2017. I wanted to appear at the hearing, but due to the Seizure Order, I was unable to withdraw even $3,000/month from the frozen accounts to pay for legal and personal expenses. Despite multiple attempts, including my solicitation of a police officer to help me convince my bank to allow me to withdraw the amounts allowed under the order, I was not allowed to withdraw any funds. Prior to the October 23rd hearing, I called the clerk for the District Court and explained that I could not appear because I lacked funds to travel from San Jose, California, where I was living with my parents, to the District Court in Reno, Nevada. I was surprised when a warrant for my arrest was issued because I previously contacted the District Court multiple times to notify it of the extreme financial difficulties due to the TRO that left me without any funds to pay for travel.

21. On December 18, 2017, I appeared in the Nevada District Court in the

Trademark Infringement Action without counsel.  The warrant for my arrest was withdrawn.  The Court ordered me to subject myself to an examination by Epson's counsel.  Because I was without counsel, and because English is not my first language, I was uncomfortable being examined under these circumstances, and was concerned that I would be misunderstood (or would misunderstand questions).  Accordingly, I asked several times that the examination be continued until I could secure new counsel.  I acknowledge that I was less responsive to questions during this examination than when I was deposed on March 28, 2017 with my counsel present.  I was concerned that testifying without counsel would lead to loss of my legal rights, and the loss of the ART's legal rights, and damage our position further.

**REORGANIZATION OF ART.**

22.     In addition to the real estate holdings described above, I believe there is a reasonable possibility for ART to reorganize.  Prior to being financially shackled by the orders in the Infringement Action, ART had additional product lines that have no relation to the alleged infringement – printer products, beauty products and other office products.  With the protections in the Bankruptcy Code, ART can continue its business for these product lines.

23.     In prior years, ART has been able to generate profits in its printer and beauty product lines of business.

24.     For the printer product business line, ART generated the following approximate amounts in sales, costs of goods sold, and net income, all of which are approximations based on information available to me on the date of this declaration:

| Year | Sales | COGS | Net Income |
|------|-------|------|-----------|
| 2017 (about half year) | $2,153,353 | $1,970,131 | $183,222 |
| 2016 | $2,571,501 | $2,363,512 | $207,989 |
| 2015 | $1,700,310 | $1,549,964 | $150,346 |
| 2014 | $1,051,637 | $930,653 | $120,984 |

25.     For the beauty product business line, including various beauty products related to makeup, skin care, hair care, and other miscellaneous beauty products, ART generated the following approximate amounts of sales, costs of goods sold, and net income, all of which are approximations based on information available to me on the date of this declaration:

DECLARATION IN SUPPORT DEBTOR'S OPPOSITION TO MOTION TO DISMISS, ETC.

| Year | Sales | COGS | Net Income |
|---|---|---|---|
| 2016 | $170,441 | $120,984 | $31,871 |
| 2015 (about half year) | $124,910 | $98,354 | $26,555 |

26.     In addition, I believe that ART can successfully generate profits from the office products line of business, including the sale of scanners, laptops, and other computer related parts.  ART is also considering adding a business line for the sale of real estate, in which I have developed some specialized expertise.

27.     Because of the intensity of the litigation in the Infringement Action over the last sixteen months or so, I have not been able to expend significant time, resources or effort to fully advance the sales of these product lines.  However, based on prior experience, knowledge of the international markets, knowledge of these product lines, and relationships with existing suppliers and purchasers, I estimate that in 2018, revenue for these product lines should generate a total of about $260,000 in net income.  I believe this is a conservative estimate for 2018 net income for a number of reasons:  it only includes an estimate of generating approximately $200,000 in net income from the printer product line, and $60,000 in net income from the beauty product line; it does not account for any net income from the office products line of business or the real estate line of business; and it does not account for any net income from the ink cartridge line of business, which I believe ART can restart after prevailing in its dispute with Epson concerning alleged infringement.

28.     With my continuing efforts to acquire and sell real properties through my businesses, and with ART's viable stream of business, I expect that both ART and I can reorganize, and that creditors will be paid in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed on January 29, 2018 at San Francisco, California.

/s/ Artem Koshkalda
Artem Koshkalda

DECLARATION IN SUPPORT DEBTOR'S OPPOSITION TO MOTION TO DISMISS, ETC.